Rel: January 17, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

———————————————

## CR-2024-0655

———————————————

## Ex parte State of Alabama

## PETITION FOR WRIT OF MANDAMUS

## (In re: State of Alabama

## v.

## Antonio Pogue)

## (Baldwin Circuit Court: CC-21-1511)

PER CURIAM.

The District Attorney for the Twenty-Eighth Judicial Circuit filed this petition for a writ of mandamus on behalf of the State of Alabama requesting that this Court direct Judge Scott P. Taylor of the Baldwin

Circuit Court to set aside his July 17, 2024, order granting Antonio Pogue's motion for a new trial. For the following reasons, we deny the State's petition.

Pogue was arrested on July 3, 2020, for trafficking methamphetamine, see § 13A-12-231(11), Ala. Code 1975, and was subsequently indicted for that crime. Pogue's trial commenced on May 6, 2024. During the trial, the State presented Mary Burns, the Drug Chemistry Section Chief for the Mobile Regional Laboratory of the Alabama Department of Forensic Sciences ("the DFS"), as its expert in drug-chemistry analysis to testify as to the controlled substance in the case. Burns, however, did not perform the original analysis on the substance. That analysis was performed instead by Sherry Steele, who had formerly worked in the DFS's Montgomery laboratory and had retired from her employment with the DFS by the time of Pogue's trial.[1] Burns testified that, upon receiving the State's subpoena, she had looked up the information about the case in the DFS's laboratory information management system ("LIMS"), had reviewed the data from Steele's

_____

[1]The State had initially disclosed to Pogue that Steele would be its expert witness. However, Burns was offered as a substitute expert witness.

2

analysis as well as the photographs taken during Steele's analysis, and had come to the same conclusion as Steele -- that the substance was indeed methamphetamine. Although Pogue did not object to Burns's being accepted as an expert in drug-chemistry analysis, he did object to Burns's testimony on the ground that her testimony purportedly violated Pogue's rights under the Confrontation Clause of the Sixth Amendment to United States Constitution because the certificate of analysis constituted a testimonial statement.[2] Judge Taylor overruled Pogue's objection, noting that Burns had been involved in the case for quite some time and had appeared at a previous hearing in the case, that the DFS's report had been disclosed to Pogue during discovery, and that Pogue had not objected to Burns's being qualified as an expert. Accordingly, Judge Taylor did not believe that Pogue's right to confront the witness had been violated. When the State moved to enter into evidence the certificate of analysis issued by Steele as well as photographs and other documents pertaining to Steele's testing of the substance, Pogue again objected,

---

[2]Pogue also objected to Burns's testimony on the grounds that her testimony constituted hearsay, that the State had failed to establish a proper chain of custody, and that the State had failed to disclose Burns as an expert witness.

arguing that the certificate of analysis was testimonial and that his constitutional right to confrontation was being violated by his being unable to question the individual who had prepared the certificate of analysis. Judge Taylor overruled that objection.

On May 9, 2024, a jury found Pogue guilty of trafficking methamphetamine, and Judge Taylor adjudged him guilty of that crime. On July 8, 2024, before sentencing, Pogue filed a motion for a new trial. In that motion, Pogue argued that he was entitled to a new trial because Judge Taylor had erred in allowing the State to admit the report prepared by Steele through the testimony of Burns. Specifically, he argued that the State had not proved that Steele was unavailable to testify merely because she had retired from the DFS and that Steele's statements were admitted for their truth. In support of his argument, Pogue cited <u>Smith v. Arizona</u>, 402 U.S. 779 (2024), a decision issued by the Supreme Court of the United States on June 21, 2024, which was after his conviction. In that case, the Court held that a "State may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her," and that "[n]either may the State introduce those

4

statements through a surrogate analyst who did not participate in their creation." 602 U.S. at 802-803.

Because Rule 24.1, Ala. R. Crim. P., requires that a defendant be sentenced before granting a motion for a new trial, see State v. Simpson, 354 So. 3d 1076 (Ala. Crim. App. 2021), Judge Taylor pronounced a sentence of 15 years in prison upon Pogue on July 10, 2024, and then set a hearing on the motion for a new trial for July 17, 2024. During the hearing, Judge Taylor concluded that Pogue's rights under the Confrontation Clause had been violated based upon the holding in Smith v. Arizona, supra. Thus, following the hearing, Judge Taylor entered an order on July 17, 2024, granting Pogue's motion for a new trial. The State then filed this petition for a writ of mandamus. In addition to the State's petition, this Court has considered the answer filed by Pogue as well as the amicus curiae briefs filed at the request of this Court by the Alabama District Attorneys Association and the Alabama Criminal Defense Lawyers Association.

The State must establish four prerequisites for this Court to issue a writ of mandamus. "A petition for a writ of mandamus will issue only if the following prerequisites are established: (1) a clear legal right to the

relief sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) no adequate remedy at law; and (4) the properly invoked jurisdiction of the reviewing court." Ex parte Jones, 61 So. 3d 1104, 1106-07 (Ala. Crim. App. 2010). Additionally, an appellate court may issue a writ of mandamus only when it has been presented with "rare and/or exceptional circumstances" justifying the setting aside of a trial court's order granting a motion for a new trial. See State v. Ellis, 165 So. 3d 576, 581 (Ala. 2014). As the Alabama Supreme Court noted in Ellis:

> "'In cases such as this one, where the court grants a motion for new trial for grounds other than, or in addition to, a finding that the verdict is against the great weight or preponderance of the evidence, our review is limited:
>
>> "'"It is well established that a ruling on a motion for a new trial rests within the sound discretion of the trial judge. The exercise of that discretion carries with it a presumption of correctness, which will not be disturbed by this Court unless some legal right is abused and the record plainly and palpably shows the trial judge to be in error."
>
> "'Kane v. Edward J. Woerner & Sons, Inc., 543 So. 2d 693, 694 (Ala.1989) (citation omitted). See also, Land & Assoc., Inc. v. Simmons, 562 So. 2d 140, 148 (Ala.1989).'

6

"Curtis v. Faulkner Univ., 575 So. 2d 1064, 1065 (Ala.1991)."

165 So. 3d at 581.

We initially note that the State has satisfied the third and fourth prerequisites for the issuance of a writ of mandamus. The State does not have the right to appeal a trial court's order granting a defendant's motion for a new trial. See State v. Simpson, supra. Thus, the State does not possess an adequate remedy at law. Likewise, the State has properly invoked the jurisdiction of this Court by filing this petition for a writ of mandamus within 42 days of Judge Taylor's issuing his order granting Pogue's motion for a new trial. See State v. Ellis, supra.

We now turn to the first prerequisite for the issuance of a writ of mandamus, i.e., whether the State has a clear legal right to the relief it seeks. The State contends that it does because, it alleges, Pogue's right to confrontation was not violated. Specifically, the State asserts that Burns testified that she had reviewed the DFS's file and had conducted an independent review of the data. She described the pertinent information in the case file, including photographs, chain-of-custody forms, and data associated with the instrumental analysis performed. She explained how each drug-analysis tool operates and how DFS

employees perform their tests. She described how she had reviewed the data contained in the case file to ensure that the instrument had operated properly when Steele had performed her analysis, including the "batch packet" that included information about preparation of the instrument. She additionally explained the process followed under standard operating procedures to evaluate a substance. She described how typically a substance is placed into a gas chromatograph mass spectrometer to determine the chemical composition of the substance. After reviewing the data in the file from Steele's analysis, Burns gave her own opinion that the substance in question was methamphetamine. In addition, Burns explained the DFS's standard operating procedures to ensure that their electronic scales are balanced and functioning properly. She described how, as part of her review, she examined the data entries that were recorded throughout testing regarding the balance and calibration of the scales used by Steele to test the weight of the substance. Burns then testified that, based upon her review of the entire case file, her conclusions matched those of Steele. She also testified that she had employed a second scientist to peer review her conclusion, which the second scientist confirmed. The State argues that there was not a

8

Confrontation Clause violation because Burns testified as to her own conclusion based upon her examination of the data. In support of its argument, the State cites this Court's decisions in Chambers v. State, 181 So. 3d 429 (Ala. Crim. App. 2015), and Belcher v. State, 341 So. 3d 237 (Ala. Crim. App. 2020).

In Chambers, the defendant asserted that the trial court had erred in admitting the scientific test results on DNA samples because Donna Gibbons, the scientist who had testified at trial, was not present during the testing, did not actually handle the DNA evidence, and was not the supervisor of Patrick Goff, the scientist who had conducted the DNA testing. Because Goff did not testify, the defendant argued, his right to confront and cross-examine witnesses called to testify against him was violated. This Court held:

> "In the instant case, Patrick Goff, a forensic scientist with the Alabama Department of Forensic Sciences ('DFS') performed a DNA analysis on the blood mixture taken from the tip of the latex glove. Goff was unable to testify at trial, and Donna Gibbons, a forensic scientist also employed by DFS, testified on his behalf. Gibbons was not Goff's immediate supervisor and was not present when Goff tested the sample, but testified that she had reviewed Goff's test results and the case packet Goff had used when he made his interpretation about whether Chambers was included in the DNA mixture sample. Gibbons explained that DFS took a 'team approach' and that a 'certain individual will screen

9

evidence and then they will cut it, put it into a tube and then the next individual will take that to the DNA testing process and they will run that, and then another individual ... will come behind them and actually take the case packet, which is all the DNA testing process paperwork and write a report from all of that paperwork.' ... Gibbons continued to explain that once a report is prepared, a second scientist will 'come behind you and review all of that paperwork and come to their own conclusions and interpretations to see if the reporting scientist reported it out correctly.' ... Gibbons testified that she was the secondary scientist who reviewed Goff's work and the data in Chambers's case. Gibbons testified that she had to review the materials because it was standard procedure and it also was necessary in cases such as Chambers's where the person who reported it was not available. Gibbons testified that the reviewing scientist 'takes sole responsibility for [the report] also, so [he or she] is able to come testify ... about the evidence.' ...

"In reviewing Goff's work, Gibbons conducted two reviews. Gibbons testified that '[o]ne is a technical review to make sure the actual technical process was done correctly and administrative reviews, checking the case number, periods in the report ... making sure the names match in the case filed.' ... Gibbons noted that there was no indication of an error in the population-frequency calculations that were performed in this case. Gibbons testified that she made her own interpretations and conclusions based on the information in the case packet and compared her interpretations and conclusions with Goff's report. Gibbons testified that her conclusions were her own and that her conclusions in the DNA analysis matched those of Goff, who had been at DFS for approximately the same amount of time as her. Gibbons stated that Goff followed the rules and best practices in this case.

"Gibbons's testimony about the DFS processes, including her technical and administrative review of Goff's

10

work that included the entire case packet and her independent conclusions based on her review of the entire case packet provided Chambers with ample opportunity to cross-examine Gibbons regarding the DNA-analysis report. Therefore, we find that Chambers's right to confront the witnesses against him was not violated when Gibbons testified on Goff's behalf regarding the DNA-analysis report."

Chambers v. State, 181 So. 3d at 437-38. In reaching that conclusion, this Court relied on the Alabama Supreme Court's holding in Ex parte Ware, 181 So. 3d 419 (Ala. 2014), which analyzed the decision of the Supreme Court of the United States in Crawford v. Washington, 541 U.S. 36 (2004), and its progeny. The Alabama Supreme Court observed in Ware:

"The Sixth Amendment of the United States Constitution provides in part that, '[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ....' In Ohio v. Roberts, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), the United States Supreme Court held that the Confrontation Clause does not bar admission of an unavailable witness's statement against a criminal defendant if the statement bears 'adequate "indicia of reliability."'

"In Crawford [v. Washington, 541 U. S. 36 (2004)], the United States Supreme Court overruled Roberts, rejecting the 'reliability' standard and holding that the right to confront witnesses applies to all out-of-court statements that are 'testimonial.' 541 U.S. at 68. Although the Crawford Court did not arrive at a comprehensive definition of 'testimonial,' it noted that 'the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal

11

procedure, and particularly its use of <u>ex parte</u> examinations as evidence against the accused.'  541 U.S. at 50.

"The <u>Crawford</u> Court described the 'core' class of statements covered by the Confrontation Clause as follows:

> "'Various formulations of this core class of "testimonial" statements exist: "<u>ex parte</u> in-court testimony or its functional equivalent -- that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; "extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."'

"541 U.S. at 51-52 (internal citations omitted).  <u>Crawford</u> held that a statement made by the defendant's wife during police interrogation was testimonial and subject to the Confrontation Clause.

"Since <u>Crawford</u>, the Supreme Court has released three decisions addressing the application of the Confrontation Clause to forensic-testing evidence. In <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), the Supreme Court held that a sworn certificate of analysis attesting that certain materials were cocaine was a testimonial statement.  The Court in <u>Melendez-Diaz</u> declined to create a forensic-testing exception, and it rejected the argument that the certificate at issue there was not testimonial because it was not 'accusatory.'

12

"In <u>Bullcoming v. New Mexico</u>, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), the Supreme Court held that the Confrontation Clause applied to an unsworn forensic-laboratory report certifying the defendant's blood-alcohol level, where the report was specifically created to serve as evidence in a criminal proceeding and there was an adequate level of formalities in the creation of the report.

"In <u>Williams v. Illinois</u>, 567 U.S. 50, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012), the United States Supreme Court held, in a plurality opinion, that the Confrontation Clause was not violated where an expert was allowed <u>to offer an opinion</u> based on a DNA-profile report prepared by persons who did not testify and who were not available for cross-examination. <u>Williams</u> involved a bench trial in which a forensic specialist from the Illinois State Police laboratory testified that she had matched a DNA profile prepared by an outside laboratory to a profile of the defendant prepared by the state's lab. <u>The outside lab's DNA report was not admitted into evidence</u>, but the testifying analyst was allowed to refer to the DNA profile as having been produced from the semen sample taken from the victim.

"The plurality opinion concluded that the analyst's testimony was not barred by the Confrontation Clause for two independent reasons, neither of which received the concurrence of a majority of the Court. First, the plurality concluded that the expert's testimony was not admitted for the truth of the matter asserted but was admitted only to provide a basis for the testifying expert's opinions. Second, the plurality concluded that the DNA-profile report was not testimonial because its primary purpose was not to accuse the defendant or to create evidence for use at trial, but 'for the purpose of finding a rapist who was on the loose.' <u>Williams</u>, 567 U. S. at 58, 132 S. Ct. at 2228. The <u>Williams</u> plurality also noted the inherent reliability of DNA-testing protocols and the difficulties in requiring the prosecution to produce the analysts who actually did the testing.

13

"Justice Thomas concurred in the judgment in <u>Williams</u> based on his conclusion that the DNA-profile report 'lacked the requisite "formality and solemnity" to be considered "testimonial" for purposes of the Confrontation Clause.' <u>Williams</u>, 567 U.S. at 104, 132 S. Ct. at 2255 (Thomas, J., concurring in the judgment). Justice Thomas, however, 'shar[ed] the dissent's view of the plurality's flawed analysis.' <u>Id.</u>

"In light of the fractured nature of the decision in <u>Williams</u>, it is not clear how the United States Supreme Court will treat forensic reports under the Confrontation Clause. Justice Kagan concluded her dissenting opinion in <u>Williams</u> as follows:

"'[The] clear rule [of Confrontation Clause precedent] is clear no longer .... What comes out of four Justices' desire to limit <u>Melendez-Diaz</u> and <u>Bullcoming</u> in whatever way possible, combined with one Justice's one-justice view of those holdings, is -- to be frank -- who knows what. Those decisions apparently no longer mean all that they say. Yet no one can tell in what way or to what extent they are altered because no proposed limitation commands the support of a majority.'

"567 U.S. at 141, 132 S. Ct. at 2277 (Kagan, J., dissenting). See also <u>United States v. Pablo</u>, 696 F.3d 1280, 1293 (10th Cir. 2012) (noting that, in light of the divided opinions in <u>Williams</u>, admission of forensic reports over a Confrontation Clause objection 'is a nuanced legal issue without clearly established bright line parameters')."

181 So. 3d at 413-16.

14

Likewise in Belcher, supra, a case involving the imposition of the death penalty, the defendant argued that the circuit court had committed plain error by allowing the admission of a DNA report when the forensic biologist who testified regarding the results contained in the DNA report did not conduct all the tests that were utilized to reach the conclusions contained in the report. The defendant argued that his right to confront his accusers had been violated. During her testimony, the forensic biologist who testified stated that all the testing done had been "either validated by [her], approved by [her], or performed by [her]." 341 So. 3d at 265. Based on the Alabama Supreme Court's holding in Ex parte Ware, this Court concluded that there was "no error, much less plain error, in the admission of the DNA report." 341 So. 3d at 267.

On June 21, 2024, the Supreme Court of the United States announced its decision in Smith v. Arizona, supra, in which that Court resolved the "who knows what" confusion relating to the Confrontation Clause as referenced in Justice Kagan's dissent in Williams v. Illinois, 567 U.S. 50 (2012). In Smith, the defendant was arrested for possession of methamphetamine for sale, possession of marijuana for sale, possession of narcotic drugs for sale, and possession of drug

paraphernalia after a search warrant had been executed on his property. The items seized were sent to a crime lab run by the Arizona Department of Public Safety for a full scientific analysis. An analyst ran the requested tests. She prepared a set of typed notes that documented her lab work and results as well as a signed report. Those notes included a description of each item, noted the weight of each item and how the item was measured, identified the tests run on each item and the results of the tests, and a conclusion about each item's identity. The State of Arizona initially disclosed the analyst who had performed the test as its expert witness. However, before trial, the analyst left the employ of Arizona's Department of Public Safety. The State of Arizona thus decided not to rely on that analyst as its expert witness and filed an amendment to its final pretrial statement striking the analyst's name and adding the name of a forensic scientist as a substitute expert. The State of Arizona wrote in its amendment that "'[the forensic scientist] will provide an independent opinion on the drug testing performed by [the analyst]'" and that the forensic scientist "'is expected to have the same conclusion'" as the analyst. 602 U.S. at 790. At trial, the forensic scientist indeed testified as to the same conclusion as the analyst, relying

16

on the analyst's report and notes. The forensic scientist testified as to the scientific methods used by the analyst to analyze the items. He testified how the analyst had adhered to general principles of chemistry as well as the Arizona Department of Public Safety's policies and procedures and explained to the jury how the analyst had confirmed that the equipment was not contaminated. After telling the jury what the analyst's notes and report said about her testing of the items, he offered his independent opinion of the identity of those items. Specifically, he opined that there were usable quantities of marijuana, methamphetamine, and cannabis. At the conclusion of the trial, the defendant was convicted.

The defendant appealed to the Arizona Court of Appeals, Division One, arguing that the forensic scientist's testimony had violated his Confrontation Clause rights because the forensic scientist had formed his opinions by relying on the nontestifying analyst's analysis. The Arizona Court of Appeals rejected the defendant's Confrontation Clause challenge and affirmed his conviction in an unpublished memorandum decision. See Smith v. State, No. 1 CA-CR 21-0451, July 14, 2022 (Ariz. Ct. App. 2022) (not reported in Pacific Reporter). In doing so, it relied on State ex rel. Montgomery v. Karp, 236 Ariz. 120, 336 P.3d 753 (Ct. App. 2014),

wherein it had held that an "expert may testify when the basis of her independent opinion are forensic reports prepared by a non-testifying expert, if the testifying expert reasonably relied on these facts and data to reach her conclusions." 236 Ariz. at 122, 336 P.3d at 755. The Arizona Court of Appeals concluded that the forensic scientist had presented his independent expert opinion permissibly based upon the analyst's work and noted that the testifying forensic scientist had been subjected to cross-examination. That court also noted that the State did not introduce the analyst's opinions or any of her work-product documents into evidence. The defendant petitioned the Arizona Supreme Court for review, and that court denied his petition.[3] He then petitioned the Supreme Court of the United States for certiorari review, which that Court granted.

The Supreme Court of the United States rejected the reasoning of the Arizona Court of Appeals. The Supreme Court initially observed that the Confrontation Clause's prohibition against admission of an absent

---

[3]The denial of the defendant's petition for review is noted in the Arizona Supreme Court's minutes of January 6, 2023. (at the time this decision was issued, those minutes could be located at https://www.azcourts.gov/Portals/21/DRAFT%20Floating%20PR%20Minutes.pdf).

18

witness's statement unless the witness is unavailable and the defendant has had a prior chance to subject the absent witness to cross-examination is applicable only to "testimonial hearsay." 602 U.S. at 783-786. To be testimonial hearsay, it must be a testimonial statement and the statement must be offered to prove the truth of the matter asserted. Id. Thus, the Court noted that Smith's Confrontation Clause claim could succeed only if the analyst's statements came into evidence for their truth. Smith argued that the statements had been offered to establish what the analyst said happened in the laboratory had, in fact, occurred. The State of Arizona, however, argued that the analyst's statements came into evidence not for their truth but to show the basis of the testifying forensic scientist's independent opinion. It emphasized that Rule 703, Ariz. R. Evid. -- like Rule 703, Ala. R. Evid. -- "authorizes the admission of such statements only for that purpose -- i.e., to 'help[] the jury [to] evaluate' the opinion testimony." 602 U.S. at 793-94. The Court noted:

> "Evidentiary rules, though, do not control the inquiry into whether a statement is admitted for its truth. That inquiry, as just described, marks the scope of a federal constitutional right. ... And federal constitutional rights are not typically defined -- expanded or contracted -- by reference to non-constitutional bodies of law like evidence rules. The

confrontation right is no different, as <u>Crawford [v. Washington</u>, 541 U.S. 36 (2004),] made clear. 'Where testimonial statements are involved,' that Court explained, 'the Framers [did not mean] to leave the Sixth Amendment's protection to the vagaries of the rules of evidence.' 541 U. S. at 61. Justice Thomas reiterated the point in <u>Williams [v. Illinois</u>, 567 U.S. 50 (2012)]: '[C]oncepts central to the application of the Confrontation Clause are ultimately matters of federal constitutional law that are not dictated by state or federal evidentiary rules.' 567 U. S. at 105 (opinion concurring in judgment). We therefore do not 'accept [a State's] nonhearsay label at face value.' <u>Id.</u>, at 106; see <u>id.</u>, at 132 (Kagan, J., dissenting). Instead, we conduct an independent analysis of whether an out-of-court statement was admitted for its truth, and therefore may have compromised a defendant's right of confrontation."

602 U.S. at 794. In agreeing with Smith's assertion that the analyst's statements in her report and notes were offered for their truth, the Supreme Court stated:

"But truth is everything when it comes to the kind of basis testimony presented here. If an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts. How could it be otherwise? 'The whole point' of the prosecutor's eliciting such a statement is 'to establish -- <u>because of the [statement's] truth</u> -- a basis for the jury to credit the testifying expert's' opinion. <u>Stuart [v. Alabama]</u>, 586 U.S.[1026,]1028 [(2018)] (Gorsuch, J., dissenting from denial of certiorari) (emphasis in original). Or said a bit differently, the truth of the basis testimony is what makes it useful to the prosecutor; that is what supplies the predicate for -- and thus gives value to -- the state expert's opinion. So '[t]here is no meaningful distinction between disclosing an

out-of-court statement' to 'explain the basis of an expert's opinion' and 'disclosing that statement for its truth.' <u>Williams [v. Illinois]</u>, 567 U.S. [50,] at 106 [(2012)] (Thomas, J., concurring in judgment). A State may use only the former label, but in all respects the two purposes merge.

"Or to see the point another way, consider it from the factfinder's perspective. In the view of the Arizona courts, an expert's conveyance of another analyst's report enables the factfinder to 'determine whether [the expert's] opinion should be found credible.' [<u>State ex rel. Montgomery v.</u>] <u>Karp</u>, 236 Ariz. [120,] 124, 336 P.3d [753,] 757 [(Ct. App. 2014)]; see [<u>People v.</u>] <u>Williams</u>, 238 Ill. 2d [125,] 144, 939 N.E.2d [268,] 278 [(2010] (also stating that such a report 'aid[s] the jury in assessing the value of [the expert's] opinion'); <u>supra</u>, at 787-788, 792. That is no doubt right. The jury cannot decide whether the expert's opinion is credible without evaluating the truth of the factual assertions on which it is based. See D. Kaye, D. Bernstein, A. Ferguson, M. Wittlin, & J. Mnookin, The New Wigmore: Expert Evidence § 5.4.1, p. 271 (3d ed. 2021). If believed true, that basis evidence will lead the jury to credit the opinion; if believed false, it will do the opposite. See <u>Williams</u>, 567 U. S., at 106, and n. 1 (Thomas, J., concurring in judgment); <u>id.</u>, at 126-127 (Kagan, J., dissenting). But that very fact is what raises the Confrontation Clause problem. For the defendant has no opportunity to challenge the veracity of the out-of-court assertions that are doing much of the work."

602 U.S. at 795-96. Accordingly, insomuch as <u>Chambers v. State</u> and <u>Belcher v. State</u> held that testimonial out-of-court statements of a forensic analyst can be presented by a surrogate expert, those decisions have been abrogated by <u>Smith v. Arizona</u>.

21

The question that the Court left unresolved in Smith v. Arizona -- and in fact left for the Arizona Court of Appeals' consideration on remand -- is whether the out-of-court statements of the analyst, conveyed to the jury by the forensic scientist, are testimonial. The State argues in this case that Steele's statements contained in the DFS's file and relied upon by Burns were not testimonial. We need not determine whether all of Steele's statements were testimonial because, under Supreme Court of the United States' precedent, some of her statements were indeed testimonial. In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), prosecutors entered into evidence bags of cocaine seized from the defendant or that had been stashed by the defendant in the police cruiser that had transported him to the police station as well as three certificates of analysis showing the results of forensic analyses performed on the substances. The certificates, sworn to before a notary public as required by Massachusetts law, reported the weight of the seized bags and stated that the bags had been examined and found to contain cocaine. The Supreme Court held that an analyst's certificate of analysis, while denominated by law as a certificate, constitutes an affidavit and

therefore was a testimonial statement covered by the Confrontation Clause.

During Burns's testimony, the following exchange occurred:

"Q.	[State's counsel:] Ms. Burns, I'm showing you State's Exhibit 14.  Do you recognize that document?

"A.  [Burns:] Yes, I could.

"Q.  Okay.  Can you tell us what that document is, and not really the contents just yet, just what is it?

"A.  It is a drug chemistry Certificate of Analysis.

"Q.  Okay.  And is that a part of the case file?

"A.  It is.

"Q.  Okay.  What is it's [sic] purpose in the case file?

"A.  The purpose of the Certificate of Analysis is to reveal the information contained for this case and to -- the results of our analyses.

"Q.  Okay.  And when is that -- when is that certificate produced in the process of testing?

"A.  The final certificate, approved certificate as I am looking at it right now is the final part of the whole analysis process.  Because this is the approved document that underwent peer review.

"Ms. Steele issued what we consider a draft report along with her case record for the review process.  And as I testified to earlier, a peer reviewed that information and then documented that review process in our LIMS system.

"So when I have been made known to look at this as a full case record, I then took that Certificate of Analysis, the approved Certificate of Analysis, and compared that to the information within the case record and deemed it to be accurate.

"Q. Okay. And so is State's Exhibit 14 a fair and accurate depiction of the Certificate of Analysis that was issued in this case?

"A. Yes."

Pogue's counsel then objected to the admission of the certificate of analysis, arguing that the State was "attempting to admit an exhibit that is from someone else, a non-sworn statement in the name of Sherry Steele, and we object to the testimony as them attempting to admit it as testimonial in nature, Your Honor. And Ms. Steele is not here." Judge Taylor overruled Pogue's objection.

Section 12-21-300(b), Ala. Code 1975, provides:

"To be admissible pursuant to this section, a certificate of analysis shall contain all of the following:

"(1) The date and time the evidence was delivered to the facility.

"(2) The name of the person making the delivery, and the name of the person receiving the delivery.

"(3) A brief description of the evidence.

24

"(4) The type of examination or analysis requested.

"(5) The name of the person making the examination or analysis.

"(6) The date or dates of the examination or analysis.

"(7) The results of the examination or analysis.

"The certificate of analysis shall give the name and address of the facility in which the examination or analysis was made, and it shall be signed by and sworn to as true and correct, under penalty of law, by the person making the examination or analysis."

As under Massachusetts law, a certificate of analysis in Alabama must be signed by and sworn to as true and correct, under penalty of law, by the person making the examination or analysis. Thus, pursuant to the holding in <u>Melendez-Diaz</u>, the certificate of analysis executed by Steele was a testimonial statement. Under the holding of <u>Smith v. Arizona</u>, it could not be admitted through the testimony of Burns.

Rule 24.1(c), Ala. R. Crim. P., provides that a trial court "may grant a new trial for the reason that the verdict is contrary to law or to the weight of the evidence or, if <u>for any other reason, the defendant has not received a fair and impartial trial</u>." (Emphasis added.) Because the State offered the certificate of analysis executed by Steele through Burns, a

25

surrogate analyst -- even though Burns used the results of Steele's analysis as the basis of her expert opinion -- and that certificate was admitted into evidence, Judge Taylor did not err in granting Pogue's motion for new trial. See Smith v. Arizona, supra. Therefore, the State has failed to establish the first prerequisite for the issuance of a writ of mandamus -- that it has a clear legal right to the relief it seeks. No legal right has been abused and the record does not plainly and palpably show Judge Taylor to be in error. See State v. Ellis, supra. Accordingly, this petition for a writ of mandamus is due to be, and is hereby, denied.

PETITION DENIED.

Windom, P.J., and Kellum, Cole, and Minor, JJ., concur. McCool, J., dissents.